[Cite as *In re E.S.*, 2014-Ohio-3067.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

In re E.S, Z.S.

Court of Appeals Nos. OT-14-008
OT-14-009
OT-14-011
OT-14-012

Trial Court Nos. 21230038
21230039

**<u>DECISION AND JUDGMENT</u>**

Decided:  July 10, 2014

* * * * *

Kevin M. Peters, for appellant Ze.S.

Sarah A. Nation, for appellant J.S.

Mark E. Mulligan, Ottawa County Prosecuting Attorney, and
Emily M. Gerber, Assistant Prosecuting Attorney, for appellee.

* * * * *

**JENSEN, J.**

{¶ 1} J.S. and Ze.S., the mother and father, respectively, of E.S. and Z.S.,

separately appeal the February 7, 2014 decision of the Ottawa County Court of Common

Pleas, Juvenile Division, which terminated their parental rights and placed their children in the permanent custody of the Ottawa County Department of Job and Family Services ("OCDJFS"). For the reasons that follow, we affirm the trial court's judgment.

## I. Background

### A. Prior Contact with Children's Services Agency

{¶ 2} Before discussing the events that triggered OCDJFS's involvement with this family, we begin by providing some relevant history. J.S. is the mother of K.S. (born in August of 2005), E.S. (born in June of 2009) and Z.S. (born in November of 2010). Ze.S. is the father of E.S. and Z.S. He and J.S. are not married. K.S.'s father is R.S., J.S.'s former husband, who resides in the Columbus, Ohio area.

{¶ 3} In the fall of 2010, J.S., Ze.S., and the three children moved from Ohio to South Carolina. In January of 2011, a teacher noticed that K.S. had a bruise on her ear. K.S. told the teacher that the wound was inflicted by Ze.S., who had struck her, knocking her off a chair. The children's services agency in Aiken County, South Carolina, removed the children from the home and placed them in foster care. Ze.S. was charged with felony child endangering.

{¶ 4} The agency provided J.S. and Ze.S. with case plan services. Initially, J.S. had tested positive for drugs, but she and Ze.S. eventually successfully completed their case plan. The children were returned to J.S. in August of 2011. Ze.S. ultimately entered a guilty plea to a reduced charge of misdemeanor child endangering. Although he does not admit striking K.S., he claimed that it was in his best interest to enter a plea to the

2.

reduced charge because his employment would be terminated if he was convicted of a felony.

{¶ 5} In May of 2012, J.S. left South Carolina with the children and returned to Ohio. She indicated that she left Ze.S. because he was addicted to drugs and had been physically abusive toward her. Upon her return to Ohio, she obtained a civil protection order ("CPO") against him from the Ottawa County Court of Common Pleas.

{¶ 6} In June of 2012, Ze.S. returned to Ohio in a car allegedly rented by a friend. While en route, he was involved in an automobile accident in Kentucky and officers found pills in the vehicle. Ze.S. was charged with drug possession. He served 30 days in jail and was placed on probation. Once in Ohio, he was arrested on an old warrant on telephone harassment charges involving J.S.'s father, Je.S. He was sentenced to an additional three and one-half weeks in jail.

## B. OCDJFS Becomes Involved

{¶ 7} The family first came to the attention of the OCDJFS following an August 19, 2012 incident in which J.S. left E.S. and Z.S. home alone for approximately four hours. J.S. claimed that a woman named "Dawn" stopped alongside her while she was at the curb getting her mail and insisted that J.S. get in her vehicle. They drove to Dawn's apartment and went inside. Ze.S., against whom J.S. still had the CPO, arrived and Dawn allowed him into the apartment and locked the door. J.S. eventually fled to a gas station where she contacted police. Deputy James Hanney, who responded to the call, knew that J.S. had young children. He went to her home to check on their

3.

well-being and discovered that E.S., then age three, and Z.S., 19 months old, were home alone. J.S. was charged with two counts of child endangering and OCDJFS was notified of the incident. Ze.S. was charged with violating the CPO.

{¶ 8} Caseworker Aja Beckley met with J.S. on August 24, 2012, and asked J.S. to consent to a safety plan prohibiting her from leaving the children home alone unsupervised, requiring her to abide by the terms of the CPO, and providing for weekly home visits. J.S. agreed.

{¶ 9} The first home visit was scheduled for August 29, 2012. Beckley went to the home but no one was there. Beckley unsuccessfully attempted to contact J.S. She eventually made contact with J.S. on August 31, 2012. J.S. told her that she had been cleaning cottages on Put-in-Bay island and that the children were with her while she worked. She claimed that she did not have Beckley's phone number to reschedule the home visit.

{¶ 10} That day, Beckley assisted J.S. in filling out applications for a variety of social services, including Medicaid, food stamps, and daycare assistance. She told J.S. that OCDJFS would be filing for court-ordered protective services due to J.S.'s violation of the safety plan and that a case plan would be implemented. J.S. was agreeable and said that she would do anything for her children.

{¶ 11} Beckley conducted four home visits between August 19 and September 15, 2012. During those visits she met K.S. K.S. lived primarily with J.S.'s parents. Aside from the initial missed visit, Beckley had no concerns about the children's well-being.

4.

Their home was clean and appropriate, and she observed no signs of drug or alcohol use by J.S. A complaint was filed nonetheless on September 7, 2012 due to J.S.'s violation of the safety plan. It alleged the children to be neglected and dependent and requested that the court grant OCDJFS protective supervision of the children. An initial hearing and pretrial was scheduled for September 20, 2012. Stephany Skrbina was assigned as the court appointed special advocate ("CASA") and guardian ad litem ("GAL") for the children.

{¶ 12} Before the scheduled hearing, another incident occurred. On September 15, 2012, one of J.S.'s neighbors called the sheriff's office to report that J.S. was driving E.S. and Z.S. around in a golf cart while intoxicated. Deputy Gary Howell responded. He spoke with J.S. who claimed that she had had one alcoholic beverage. He administered field sobriety testing which indicated that J.S. was not impaired. While the officer was talking to J.S., E.S. and Z.S., who were on the golf cart, put the cart into gear and drove it into a trailer. Z.S. was thrown from the cart, but neither child was injured and J.S. declined medical care for them. The officer informed OCDJFS of the incident and the agency responded by obtaining an order two days later granting it emergency shelter care of the children.

## C. OCDJFS is Granted Temporary Custody

{¶ 13} In a September 24, 2012 judgment entry, the court found reasonable grounds to believe that the children were in immediate danger from their surroundings and that removal was necessary to prevent physical or emotional harm. It ordered that

5.

OCDJFS's temporary custody of E.S. and Z.S. continue and scheduled the matter for adjudication. Service on Ze.S. initially was not successful because his whereabouts were unknown. He was served, however, before the second day of the adjudicatory hearing. R.S., who also had not been immediately served, participated in the second day of the hearing as well.

{¶ 14} Evidence of the foregoing incidents was presented at the hearings. Ultimately, J.S., Ze.S., and R.S. admitted the allegations of dependency as stated in the complaints and the allegations of neglect were withdrawn. In an October 29, 2012 judgment entry, the court found clear and convincing evidence that K.S., E.S., and Z.S. were dependent children and that their condition or environment warranted the state's assumption of their guardianship under R.C. 2151.04(C).[1] The court also found that OCDJFS had made reasonable efforts to prevent the removal of the children from the home and had offered J.S. a safety plan which she violated. It concluded that it was in the best interest of the children that they remain in the temporary custody of OCDJFS pending further disposition. E.S. and Z.S. were placed with a foster family.

### D. A Case Plan is Implemented

{¶ 15} On November 9, 2012, a case plan for J.S. was filed with the court with the goal of reunification. Within a few weeks, Ze.S. was added to the case plan. The joint

---

[1] The present appeal does not concern J.S.'s and R.S.'s parental rights respecting K.S. Her care and custody will not be discussed in this decision.

case plan identified goals and expectations and action to be taken to achieve those goals and expectations. Both parents were expected to complete the plan.

{¶ 16} The main concerns expressed with respect to J.S. were (1) her ability to supervise the children, (2) her suspected substance abuse, (3) her ability to protect herself from alleged domestic abuse by Ze.S, and (4) her dependence on others in caring for her children. Under the terms of the case plan, J.S. was required to participate in diagnostic and alcohol and drug assessments within 90 days of the filing of the case plan; to be honest and forthcoming during those assessments; to follow all recommendations made as a result of those assessments; to be open and honest during counseling sessions; and to successfully complete each counseling session. She was required to maintain sobriety while in treatment and to submit to random drug and alcohol screens. She was also required to complete an agency-approved parenting class and a domestic violence program. J.S. was permitted supervised visitation with her children at Joyful Connections at least once a week for one hour and was advised to attend all scheduled visits and to maintain sobriety before and during those visits. She was expected to maintain safe and stable housing and financial stability for six months. Her progress was to be monitored through frequent announced and unannounced home visits.

{¶ 17} The main concerns expressed with respect to Ze.S. were (1) problems in his relationships with K.S. and J.S.'s parents, (2) suspected domestic violence of J.S., (3) his parenting practices, (4) his physical health, and (5) possible drug use and his recent arrests on charges of drug trafficking. Under the terms of the case plan, Ze.S. was

7.

required to provide appropriate discipline and care for his children; learn anger management; refrain from activities involving illegal drugs; address his health issues; and take medications as prescribed. The remaining requirements mirrored J.S.'s, except Ze.S. was also required to complete an agency-approved anger management and batterers' intervention class.

{¶ 18} The court approved the case plans and also ordered that each parent pay child support of $50 per month per child.

### E. J.S. Struggles to Fulfill the Case Plan

{¶ 19} OCDJFS filed periodic court summaries documenting the parents' progress toward completing the case plan. Joyful Connections also regularly filed summaries documenting the number of visits scheduled with the children, the number of times those visits were cancelled, and any issues arising during the visits. The parties also appeared in court on February 19, 2013, and their progress toward completing the case plan was reviewed.

{¶ 20} J.S.'s visitation with her children was somewhat sporadic. She canceled or failed to show on a number of occasions. There were no reports of J.S. behaving inappropriately toward her children, but there was one instance where Joyful Connection workers suspected that she was intoxicated. Also, during a January 2013 visit, she appeared unkempt, her hair and nails dirty, and she smelled of alcohol.

{¶ 21} J.S. completed the required one-day parenting class. She eventually completed her mental health and drug and alcohol assessments. She did not, however,

8.

complete recommended counseling and she was not particularly forthcoming with counselors and caseworkers. She also had problems maintaining sobriety. She missed case plan meetings and sometimes showed up to those meetings smelling of alcohol.

{¶ 22} It was reported that on December 4, 2012, J.S. went to court on K.S.'s case smelling of alcohol. A breathalyzer test administered at the courthouse revealed that she was intoxicated. She also tested positive for THC, opiates, and oxycodone on December 28, 2012. She produced a prescription for the oxycodone on that occasion, but she tested positive for oxycodone on another occasion and was not able to produce a prescription. She missed an April drug screen. And on March 16, 2013, Officer Ryan Sloan, of the Danbury police department, was dispatched to a local gas station where he found J.S. intoxicated and disoriented. She told the officer that she and Ze.S. had snorted cocaine together that morning. She also claimed that Ze.S. had poisoned her by injecting a substance into her back. She was taken to a hospital and although her behavior was consistent with cocaine use, there was no indication that she had been poisoned.

{¶ 23} On May 23, 2013, J.S. was sentenced in connection with the August 2012 child endangering charges. She was sentenced to 180 days in the Ottawa County Detention Facility ("OCDF"). During this time she was unable to visit with the children or to make progress toward her case plan.

{¶ 24} J.S. was granted furlough from September 5, 2013 to October 21, 2013, so that she could undergo necessary dental treatment. At that point, she underwent a second set of mental health and drug and alcohol assessments. She tried to schedule counseling

9.

appointments but she could not complete them because she was required to return to OCDF.

{¶ 25} Despite making some attempt toward satisfying the case plan during her furlough, it was reported to OCDJFS that J.S. continued to drink. While she and Ze.S. stayed with a friend in September of 2013, she allegedly became so intoxicated that she vomited on the living room floor and had to be dragged into the shower. The report to OCDJFS indicated that J.S. was "a mess" and was asked to leave the friend's home.

{¶ 26} During the period of OCDJFS's involvement, J.S.'s employment was sporadic at best. She worked for a short time repairing roofs and sometimes worked for her family's seasonal fish-cleaning business. She was far behind in child support payments. She never obtained housing independent of her parents' trailer, which she and Ze.S. were allegedly renting and intended to purchase. The information available to OCDJFS was that historically, J.S.'s parents would force her to leave the home during rocky periods in their relationship.

### F. Ze.S. Makes Progress but Questions Linger

{¶ 27} Ze.S. completed his mental health and alcohol and drug assessments. No further treatment was recommended. He submitted to random drug testing and, aside from one positive test very early on, all of his drug screens were negative. He attended the one-day parenting class and domestic violence intervention classes. The course facilitator reported that Ze.S.'s work was satisfactory, he was on time, and he completed his homework.

10.

**{¶ 28}** His visits with the children at Joyful Connections were fairly consistent, although there were several visits that he missed. His daytime availability for visits became limited because of conflicts during his intermittent periods of employment, which consisted primarily of some construction jobs and work for J.S.'s parents. He eventually developed a conflict on Tuesday evenings because he was taking pipe welding classes paid for by the Fatherhood Program. Despite on-and-off employment, Ze.S. was not current with his child support obligations.

**{¶ 29}** On April 5, 2013, Ze.S. was sentenced to 180 days in OCDF for his August 2012 violation of the CPO, 150 days of which were stayed. Necessarily, Ze.S. did not visit with his children during this period. He also entered a guilty plea to drug trafficking in August of 2013. He was sentenced to probation.

**{¶ 30}** Of additional concern to OCDJFS was J.S.'s claim that she and Ze.S. had snorted cocaine together in March of 2013. At that time, J.S. also told Officer Sloan that Ze.S. was operating a "meth lab." Officer Sloan went to the trailer where J.S. indicated Ze.S. could be found, and found a propane tank that seemed out of place. He also observed Ze.S. to be impaired. There was, however, no basis for pursuing J.S.'s accusation any further.

**{¶ 31}** In connection with this March of 2013 incident, J.S. reported that she was fearful of Ze.S. There was also a May 2013 incident where J.S. claimed that Ze.S. beat her up. A black eye and bruises on her legs were consistent with this accusation, but Ze.S. claimed that she fell down. So while Ze.S. appeared to have been making progress

11.

toward fulfilling the case plan and although he demonstrated appropriate behavior with his children during visitation, concerns lingered that he continued to be abusive toward J.S. and was still involved in selling drugs.

### G. The Children Thrive in Foster Care

{¶ 32} OCDJFS reported that the children were doing well with their foster family. According to the foster mother, when the children first arrived, they ate their food as fast as they could, seemingly worried as to when food would again be given to them. This issue resolved. It was noted that the children referred to their mom by her first name instead of "mom" and referred to Ze.S. as "J.S. daddy." Their foster mother indicated that the children tended to be more defiant when they returned home from visits.

{¶ 33} OCDJFS recommended that the children remain in its custody. It also recommended that J.S. and Ze.S. participate in HOPE court, a specialized court for parents whose children have been removed from their care due to substance abuse issues. J.S. and Ze.S. declined to do so because they did not want to be subject to additional obligations.

### H. OCDJFS Moves for Permanent Custody

{¶ 34} On July 19, 2013, OCDJFS filed a motion for permanent custody under R.C. 2151.413(A), 2151.414(B)(1), and 2151.414(E). This motion was based on a number of factors.

12.

**{¶ 35}** First, both J.S. and Ze.S. had been involved with the children's services agency in Aiken County, South Carolina, resulting in the children's removal from the home. Second, J.S. failed to complete the case plan. Her assessments were untimely, she was not forthcoming, she was unable to maintain sobriety, and she was serving a six-month jail sentence for child endangering, stemming from the August 2012 incident in which she left the children home alone. J.S. was not scheduled to be released until December 16, 2013. Finally, despite Ze.S.'s success in completing his portion of the case plan, concerns lingered. It was suspected that he had abused J.S. even after the case plan was implemented and he served a jail term for violating the CPO. He pled guilty to trafficking in drugs on July 1, 2013, and was scheduled to be sentenced August 22, 2013. J.S. had also made accusations that he continued to sell drugs.

**{¶ 36}** On July 25, 2013, the court appointed Patricia Kovacs to serve as the "attorney and guardian ad litem" for the children. In the meantime, OCDJFS continued to monitor the family and to file the requisite reports with the court.

### I. The GALs Disagree

**{¶ 37}** Both Stephany Skrbina, the CASA/GAL appointed on September 14, 2012, and Patricia Kovacs filed reports and recommendations with the court.

**{¶ 38}** Between September 20, 2012 and September 4, 2013, Skrbina had approximately 30 contacts with this family which included attendance at pretrials, home visits, record reviews, phone calls, observations during visits, and home visits at the foster home. She noted that it was clear that the agency and the parents did not trust one

13.

another as they worked together toward the common goal of reunification. She recognized that J.S. had been untruthful with agency staff about her efforts to complete her case plan goals, blamed others for her lack of progress, and up until recently, had refused to admit that she has a drug or alcohol problem. Skrbina believed that Ze.S. had made great progress toward meeting the goals of his case plan. She indicated that the agency had written a separate case plan for him which would require him to sign an affidavit promising that the children would not see J.S. She explained that Ze.S. declined to sign it because he plans to marry her. She observed that OCDJFS seemed to distrust Ze.S.

{¶ 39} Skrbina visited with J.S. at the Ottawa County jail on September 4, 2013. She noted that J.S. had been clean and sober for 90 days and had found "inner peace" during her sobriety. J.S. acknowledged that she had lied about having a drinking problem and told Skrbina that she was drinking to deal with the depression she experienced when her children were taken away. Skrbina indicated that J.S. was agreeable to attending counseling and following the recommendations for treatment of her depression and alcoholism.

{¶ 40} Skrbina acknowledged that the kids were happy and had thrived in private foster care. She visited them monthly and found the foster parents to be doing an excellent job. She observed that at first E.S. seemed to be accustomed to taking care of her brother, but had learned to give up that role to the foster mother. The kids looked forward to their regular visits with their parents.

14.

{¶ 41} Ultimately, Skrbina recommended that the agency grant a six-month extension to the case plan and permit increased visitation. She also recommended that a new case plan be created for J.S. upon her release from jail and that mandatory participation in HOPE court be part of that plan. She did not believe that Ze.S. should be forced to sign the affidavit that would have divided him and the children from J.S. She had no concerns about the parents' interaction with the children during their visits.

{¶ 42} Kovacs had a different opinion. Although she never met the kids, never observed them with their parents or foster parents, never visited J.S.'s and Ze.S.'s home, and had met the couple only once for an hour and one-half, she believed that permanent custody should be awarded to OCDJFS. She was concerned about the history of dysfunction and domestic violence during the couple's relationship. Although she acknowledged that Ze.S. had completed the case plan and was currently employed, she expressed concern about his ability to control his anger and his prior criminal convictions—particularly his conviction arising from the incident in South Carolina where he was accused of striking K.S. She referred to the fact that Ze.S. has two 15-year-old children with two different women with whom he maintains no contact. She mentioned that he was polite and articulate, but she remarked that he could not be trusted and that it was known in the Port Clinton area that he continued to sell drugs.

{¶ 43} Kovacs noted that J.S. had not completed her case plan. Although J.S. reported that she had been sober for 100 days, Kovacs indicated that J.S. missed several visits with the kids, failed to pay child support, and refused to participate in HOPE court.

15.

She emphasized her concern with J.S.'s failure to follow through with domestic violence services and that she continued to live with her abuser. She did not feel that J.S. could protect the children from Ze.S.

{¶ 44} On the other hand, she described the foster parents as "amazing." She noted their desire to adopt the children. She expressed concern that this was the second foster home for the kids and that they deserve a permanent, stable, and loving home. While recognizing that J.S. and Ze.S. had made some progress, had taken steps toward providing stable housing, and had taken some responsibility for their shortcomings, she ultimately believed that if the children were returned to their parents' custody, they would be at risk of J.S.'s helplessness and substance abuse and Ze.S.'s propensity for anger, erratic behavior, and financial instability.

### J. The Motion is Heard

{¶ 45} On November 26, 2013 and January 13, 2014, the court heard testimony on OCDJFS's motion for permanent custody. Kovacs and Skrbina both testified and provided opinions consistent with their reports. Aja Kohlenberg, Heather Smith, and Kelly Pape, caseworkers from OCDJFS, testified, as did Officer Ryan Sloan and Deputy Mark Nye, two of the law enforcement officials who responded to reports involving the couple; Sheila Powell of Joyful Connections; Justa Rowels and Dorothy Wilken from the Giving Tree; and Steve Hosko, the friend who reported the incident that occurred while J.S. was on furlough. Their testimony was essentially consistent with the information

16.

that they had previously provided which was included in the various court filings summarized above.

{¶ 46} Ze.S. also testified. He testified to his completion of his case plan. He discussed his plan to purchase J.S.'s parents' trailer, and he described his efforts toward securing stable employment. Specifically, he talked about his voluntary participation in the Fatherhood Program through which he was taking classes to become a certified welder and from which he obtained support in becoming "a better father in general."

{¶ 47} Ze.S. indicated that he became engaged to J.S. He expressed that she is now reaching out for help to deal with her alcoholism and that he wants to support her in combatting that disease. He talked about his visits with his kids and conceded that his schedule had become more limited due to his efforts to obtain and maintain stable employment by which he could support the children. He said he has learned to control his anger and wants to put his family back together. Having said all that, he insisted that if he was given another chance with the children and J.S. continued to have problems, he would take the children and leave. He did not specify where he could go, other than mentioning that his mother lives in Massachusetts. He said that he has no intention of moving there.

{¶ 48} On cross-examination, Ze.S. acknowledged his criminal history and prior drug use, but was adamant that he had stopped abusing drugs. He deflected many questions about allegations that he had abused J.S., denied the March and May 2013 incidents, claimed that during her furlough, J.S. had merely gotten sick at their friend's

17.

home, and insisted that if he had done the things of which he was accused, his probation would have been revoked. He acknowledged that he understood the consequences of entering into a joint case plan with J.S. He blamed J.S.'s disease (i.e., her alcoholism) for her failure to complete her case plan. He also minimized the seriousness of his altercations with J.S. and attributed many of those altercations to her drinking.

{¶ 49} Ze.S. was also cross-examined about statements E.S. had made to her foster mother which described instances where Ze.S. had harmed J.S., been physically violent with E.S., and engaged in sex in front of her. He denied all of those accusations and said that if E.S. said those things, he would find the statements unreliable due to her age.

### K. The Trial Court's Decision

{¶ 50} Ultimately the trial court granted OCDJFS's motion for permanent custody. The court found that under R.C. 2151.414(E)(1) and (16), the children could not be placed with either of their parents within a reasonable time or should not be placed with either parent, and that under R.C. 2151.414(D)(1)(a)-(d), a grant of permanent custody to OCDJFS was in the children's best interest.

{¶ 51} The court also denied a motion that Ze.S. had filed on December 12, 2013, in which he requested an extension until September 15, 2014, so that he could demonstrate stability "in all areas of his completed case plan."

{¶ 52} J.S. and Ze.S. separately appealed the trial court's decision. In her appeal, J.S. assigns the following errors for our review.

18.

I. THE TRIAL COURT ERRED IN PERMITTING THE GAL TO ACT AS AN ADVOCATE.

II. THE TRIAL COURT ERRED IN CONSIDERING THE TESTIMONY OF THE GAL.

III. APPELLANT WAS NOT AFFORDED EFFECTIVE ASSISTANCE OF COUNSEL.

IV. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF E.S. AND Z.S. TO THE OTTAWA CO. DJFS AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 53} In Ze.S.'s appeal, he assigns the following errors for our review.

ASSIGNMENT OF ERROR I:

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE OCDJFS AS THE DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

A. APPELLEE FAILED TO PROVIDE BY CLEAR AND CONVINCING EVIDENCE THAT THE CHILDREN COULD NOT OR SHOULD NOT BE PLACED WITH FATHER WITHIN A REASONABLE PERIOD PURSUANT TO OHIO REVISED CODE § 2151.414(E).

B. APPELLEE FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE GRANTING OF PERMANENT

CUSTODY TO THE OCDJFS WAS IN THE BEST INTEREST OF THE CHILDREN PURSUANT TO OHIO REVISED CODE §2151.414(D)(1)(a) - (d).

ASSIGNMENTS [sic] OF ERROR II:

THE COURT COMMITTED PLAIN ERROR BY ADMITTING THE GUARDIAN AD LITEM'S REPORT AND RELYING ON HER RECOMMENDATIONS DESPITE THE GUARDIAN AD LITEM [sic] LACK OF COMPLIANCE WITH THE SUPREME COURT SUPERINTENDENCE RULE 48(D)(13)(a)-(c).

ASSIGNMENT OF ERROR III:

FATHER WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 54} There is some overlap between the errors they assign. Where possible, we will address their common assignments of error together.

## II. Law and Analysis

### A. Allowing the GAL to Act as an Advocate

{¶ 55} In her first assignment of error, J.S. claims that the trial court improperly permitted attorney/GAL Patricia Kovacs, to act as an advocate. She claims that Kovacs was "referred to as only the Guardian ad Litem throughout the proceedings," yet she was permitted to cross-examine witnesses and make a closing argument in addition to testifying. She claims that the trial court relied on the answers elicited by Kovacs on

20.

cross-examination and considered her closing argument. J.S. claims that this error led the court to improperly grant permanent custody to OCDJFS.

{¶ 56} As pointed out by OCDJFS, J.S. made no objection at trial to Kovacs' participation at the hearing. Because of the failure to raise this objection in the lower court, we review this assignment for plain error only.

{¶ 57} "R.C. 2151.281(H) and Juv.R. 4(C)(1) permit a licensed attorney to serve as both attorney and guardian ad litem for a child in juvenile court proceedings provided the court makes an explicit dual appointment and no conflicts arise due to the dual representation." *In re D.N.*, 4th Dist. Ross No. 11CA3213, 2011-Ohio-3395, ¶ 41. Contrary to J.S.'s assertions, in its judgment entry dated July 25, 2013, the trial court expressly appointed Kovacs to act as both attorney and GAL on behalf of E.S. and Z.S. It was, therefore, appropriate for Kovacs to testify, to question witnesses, and to make closing arguments.

{¶ 58} We find J.S.'s first assignment of error not well-taken.

### B. GAL's Failure to Comply with Sup.R. 48

{¶ 59} In their second assignments of error, both J.S. and Ze.S. argue that the court erred in considering Kovacs' recommendation that their parental rights be terminated because she failed to perform the duties required of her under Sup.R. 48. Sup.R. 48 requires the GAL to represent the best interest of the child. Section (D)(13) of that rule provides:

21.

A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. In order to provide the court with relevant information and an informed recommendation as to the child's best interest, a guardian ad litem shall, at a minimum, do the following, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case:

(a) Meet with and interview the child and observe the child with each parent, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present;

(b) Visit the child at his or her residence in accordance with any standards established by the court in which the guardian ad litem is appointed;

(c) Ascertain the wishes of the child;

(d) Meet with and interview the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case;

(e) Review pleadings and other relevant court documents in the case in which the guardian ad litem is appointed;

(f) Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case;

(g) Interview school personnel, medical and mental health providers, child protective services workers and relevant court personnel and obtain copies of relevant records;

(h) Recommend that the court order psychological evaluations, mental health and/or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court; and

(i) Perform any other investigation necessary to make an informed recommendation regarding the best interest of the child.

{¶ 60} In describing her investigation, Kovacs testified that she reviewed the record and met with J.S. and Ze.S. one time at her office for an hour and one-half. She conceded that she never spoke with the children; never visited them at their foster home; never met with J.S. outside of Ze.S.'s presence despite knowing that there were allegations of domestic violence; never visited the couple's home; never spoke to either parent on the phone except to schedule the appointment to meet with them; never observed either parent interact with the children; and reviewed nothing between November 26, 2013, the first day of the hearing, and January 13, 2014, the day she testified.

23.

{¶ 61} It has been often recognized by the courts, and both J.S. and Ze.S. acknowledge, that Sup.R. 48 creates no substantive rights and does not carry the weight of the rule of law. However, they argue that Kovacs' investigation fell so far below the minimum standards of Sup.R. 48 that it warranted no consideration by the trial court. Again, neither J.S. nor Ze.S. raised this objection in the trial court, thus we review their assignments for plain error only.

{¶ 62} OCDJFS argues that Kovacs' limited investigation is excusable because at ages three and four, "the verbal ability of the children would not be conducive to forming thoughts and opinions about their current placement or their relationship with their parents," thus it would have been impracticable to conduct a meaningful interview with them. It claims that Sup.R. 48 does not require the GAL to meet repeatedly with the parents, to meet with them separately, or to visit their home. And in any event, OCDJFS argues, the trial court's reliance on the GAL's testimony and report was slight and the court had before it overwhelming evidence leading it to the same conclusion.

{¶ 63} In support of their contention that the GAL's testimony and report should have been excluded, J.S. and Ze.S. cite *Nolan v. Nolan,* 4th Dist. Scioto No. 11CA3444, 2012-Ohio-3736. *Nolan* was a child custody case in which the trial court granted the mother's motion to terminate a shared-parenting plan. Before offering his recommendation that the plan be terminated, the GAL met with the mother and the child three times at his office, met with the father and child three times at his office, reviewed some of the mother's trial exhibits, and corresponded by email with the mother's live-in

24.

boyfriend concerning his employment. *Id.* at ¶ 8. On appeal, the father argued that the trial court abused its discretion in considering the testimony and report of the GAL. The father argued that the GAL failed in his duties under Sup.R. 48 because he did not visit either parent's home, interview the child one-on-one, speak with school personnel and medical providers despite the child's behavioral issues, interview his half-sister, or meet with and investigate information about the mother's boyfriend. *Id.* at ¶ 25. The court agreed with the father. It explained:

> Ohio appellate courts have indicated that the Rules of Superintendence are general guidelines for the conduct of the courts and do not create substantive rights in individuals or procedural law. As a result, we have concluded that Sup.R. 48 does not have the force of law. We do not believe, however, that Sup.R. 48 should be ignored. And here, where the guardian ad litem fell so far below the minimum standards of Sup.R. 48(D)(13), we fail to see how his testimony or report can be considered competent, credible evidence of the Child's best interests. Accordingly, we agree that the trial court abused its discretion by considering the guardian ad litem's testimony and report. (Internal citations and quotations omitted.) *Id.* at ¶ 26.

{¶ 64} The *Nolan* court expressly limited its holding to the facts of that case, but J.S. and Ze.S. urge us to hold similarly here. Although we agree that Kovacs'

investigation could have been more expansive, we decline to find that the trial court abused its discretion in considering her testimony and report.

{¶ 65} First, there were tasks described in Sup.R. 48(D)(13) that were performed. According to Kovacs' October 10, 2013 report and recommendation filed with the court, she interviewed the parents, albeit together; she spoke with J.S.'s father; she contacted the Aiken County, South Carolina children's services agency; she spoke with the Ottawa County CASA office; and she reviewed the case plan, discovery, and the Ottawa County juvenile court record. As OCDJFS points out, the children were young and not able to offer meaningful input as to their desire to remain with their foster parents or return to their parents.

{¶ 66} Second, Kovacs' testimony at the hearing was brief and was certainly not the exclusive factor driving the court's decision. Kovacs was just one of many witnesses who provided testimony. A number of caseworkers, law enforcement officials, and other witnesses testified. In regards to her recommendation, the court noted simply:

> It is the recommendation of the Attorney for the Child/Guardian ad Litem
> that permanent custody of the children be granted to the agency. She
> emphasized that the history of these parents puts the children at too great a
> risk. She reasoned that both parents have had intervention in two states but
> their underlying behavior has not changed.

Kovacs was subject to cross-examination and counsel took that opportunity to highlight perceived deficiencies in her investigation. The trial court was permitted to believe or

disbelieve Kovacs' testimony, to assign it whatever weight it deemed appropriate, and to consider it in the context of all the other evidence before it. *See, e.g., In re M.Z.,* 9th Dist. Lorain No. 11CA010104, 2012-Ohio-3194, ¶ 35. *See also Hunter-June v. Pitts*, 12th Dist. Butler No. CA2013-09-179, 2014-Ohio-2473, ¶ 21 ("The trial court heard the context and the explanations of the guardian ad litem with regard to her investigation and in support of her recommendations, which were outlined in a 11–page report. * * * [T]he guardian ad litem was questioned by both parents' counsel. The magistrate was entitled to believe or disbelieve her testimony and to consider it in light of all of the other testimony presented at the hearing.").

{¶ 67} The juvenile court, having heard all the testimony, received the regular reports from OCDJFS and Joyful Connections, considered the competing view of Skrbina, and weighed the totality of the evidence, was able to assign the appropriate weight to give Kovacs' opinions. It was not plain error to admit her testimony and report and recommendation. We find J.S.'s and Ze.S.'s second assignments of error not well-taken.

### C. Ineffective Assistance of Counsel

{¶ 68} In their third assignments of error, J.S. and Ze.S. argue that they were provided ineffective assistance of counsel. The assignments are premised primarily on the failure of their counsel to object to the admission of Kovacs' testimony and report.

{¶ 69} We employ a two-prong test in considering a claim that a litigant was denied effective assistance of counsel. *In re Anisha N.,* 6th Dist. Lucas No. L-02-1370,

27.

2003-Ohio-2356, 6-7.  First, it must be shown that counsel's performance was so deficient as to not function as the counsel guaranteed by the Sixth Amendment, and second, it must be shown that counsel's errors were prejudicial and deprived the defendant of a reliable trial result.  *Id.*  To warrant reversal, it must be established that there is a reasonable probability that the result of the proceeding would have been different if not for counsel's unprofessional errors.  *Id.*

{¶ 70} While we do not necessarily disagree that an objection to Kovacs' report was warranted, we do not find the failure to object to rise to the level of a deficiency depriving J.S. and Ze.S. of their Sixth Amendment right to counsel.  First, it is not clear that Kovacs' testimony and report should have been excluded.  To the extent there were weaknesses in her investigation and resulting opinions, those weaknesses were tested by defense counsel on cross-examination.  In any event, Kovacs' testimony was in essence a recitation of what was learned and testified to by others.  Her testimony did not reveal any beliefs held solely by her or information uniquely known to her.  We find no prejudice resulting from counsel's failure to object to the admission of the evidence.

{¶ 71} Accordingly, we find J.S.'s and Ze.S.'s third assignments of error not well-taken.

### D.  Manifest Weight of the Evidence

{¶ 72} In Ze.S.'s first assignment of error, and in J.S.'s fourth assignment of error, they argue that the trial court's decision granting permanent custody to OCDJFS was against the manifest weight of the evidence.  J.S.'s argument in support of this

28.

assignment centers around the deficiencies of Kovacs' investigation. For the reasons previously explained, we find no merit to J.S.'s argument. Ze.S.'s argument challenges the court's findings that (1) the children could not or should not be placed with him within a reasonable period under R.C. 21251.414(E); and (2) that permanent custody in favor of OCDJFS was in the children's best interest under R.C. 2151.414(D)(1)(a)-(d).

{¶ 73} The juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.,* 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" (Internal citations omitted.) *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10. We will not reverse the trial court's decision as being against the manifest weight of the evidence so long as it is supported by some competent, credible evidence going to all the essential elements of the case. *In re P.W.* at ¶ 20.

{¶ 74} Because courts recognize a parent's right to raise his or her children as an essential basic civil right and have deemed a parent's right to custody of their children to be "paramount," parents are afforded procedural and substantive protection when termination of their parental rights is threatened. *In re Hayes,* 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). Those protections are contained within R.C. Chapter 2151.

{¶ 75} R.C. 2151.414 provides the analysis that a court must undertake when considering whether to terminate parental rights and vest permanent custody in a

29.

children's services agency. Under that provision, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(d) exists. Subsection (b) of that provision requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; and subsection (d) requires a finding that the child has been in the temporary custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22-month period. Subsection (a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re E.B.,* 12th Dist. Warren Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 14-15.

{¶ 76} If the court finds that R.C. 2151.414(B)(1)(b), (c), or (d) applies, it must next determine whether granting permanent custody to the agency is in the child's best interest. This requires the court to evaluate the factors enumerated in R.C. 2151.414(D)(1). *In re K.M.D.*, 4th Dist. Ross. No. 11CA3289, 2012-Ohio-755, ¶ 30. If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present which would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.,* 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 43.

30.

The court need not find that any of the R.C. 2151.414(E) factors are present if it relies on R.C. 2151.414(B)(1)(b)-(d) as the basis for granting permanent custody to LCCS.

{¶ 77} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *In re Tashayla S.,* 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14; *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Clear and convincing evidence is the highest level of evidentiary support necessary in a civil matter. *In re Stacey S.,* 136 Ohio App.3d 503, 520, 737 N.E.2d 92 (6th Dist.1999).

{¶ 78} Apparently finding that R.C. 2151.414(B)(1)(a) applies, the trial court undertook an analysis of whether any section (E) factor applies, indicating that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent. It went on to determine whether under section (D)(1), granting permanent custody to OCDJFS was in the best interest of the children.

{¶ 79} The trial court found that both R.C. 2151.414(E)(1) and (16) applied. Those sections provide:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and

31.

repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(16) Any other factor the court considers relevant.

**{¶ 80}** The trial court explained that although Ze.S. completed some aspects of his case plan "'on the surface,'" it was concerned that Ze.S. had "not internalized any changed behavior." The court perceived that Ze.S. was in denial of J.S.'s long-time alcohol and drug abuse; that he blamed "the 'system'"; that Ze.S. had abused J.S. to the point that she fled South Carolina and obtained a CPO against him; that even after completing the domestic violence program, he was alleged to have beaten J.S.; that he relied on J.S.'s parents for housing and given the volatility of the relationship among them, their housing situation was unstable; that Ze.S. was dishonest in his claim that he would leave J.S. if she did not stop abusing drugs and alcohol; and that it was made clear to Ze.S. that by entering into a joint case plan with J.S., reunification was dependent on both of them completing the case plan. The court also cited its concern with the amount of time the children had spent in the foster care system, first in South Carolina and then again in Ottawa County.

{¶ 81} Undeniably, Ze.S. entered into a joint case plan and was aware that both he and J.S. would have to complete the plan in order to be reunified with the children. J.S. did not complete the plan and Ze.S. refused to sign the affidavit which would allow him to enter into an individual plan. Concerns did linger over whether Ze.S. continued to abuse J.S. The deputy who testified indicated that J.S.'s injuries in May of 2013 were consistent with assault and not merely a fall. There were additional instances when J.S. expressed to OCDJFS that she feared Ze.S. to the point that she refused to visit the children with him. And the trial court, having been present for Ze.S.'s testimony, was in the best position to make credibility determinations and to judge his sincerity. We find that there was competent, credible evidence to support the court's conclusions.

{¶ 82} Turning to the R.C. 2515.414(D)(1) factors, the court gave careful consideration to whether granting permanent custody to OCDJFS was in the children's best interest. R.C. 2515.414(D)(1) provides:

> In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * *, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

33.

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child * * *.

{¶ 83} As to (a), the court found that the children were doing well in the care of their foster parents. It noted that the children's visitation with their parents had been sporadic over the last 16 months. It also found that there was no evidence that the children had a relationship with their half-siblings, maternal grandparents, or other extended family members.

{¶ 84} As to (b), the court found that the children were too young to express their wishes.

{¶ 85} As to (c), the court found that the children had remained in the same foster home since they were removed from their mother's care in September of 2012.

34.

{¶ 86} And as to (d), the court found that this was the children's second time being placed with a foster family and that the foster family wishes to adopt them. It noted the disagreement between the CASA/GAL and the attorney/GAL, but ultimately concluded that permanent custody with OCDJFS was the only means of assuring permanency for the children.

{¶ 87} Again, there was competent, credible evidence presented to support all of these findings. It was undisputed that this was the children's second placement with a foster family. It was also undisputed that the children were thriving in the care of their foster parents and that the foster family wanted to adopt them. The evidence indicated that K.S. spent time in the care of her maternal grandparents, but J.S.'s parents, when given the opportunity, declined to care for E.S. and Z.S. Neither Ze.S. nor his young children maintained any sort of relationship with Ze.S.'s older children. And at ages three and four, the children were too young to provide meaningful input as to what would be in their best interest. We, therefore, find no error in the trial court's conclusion that permanent custody in favor of OCDJFS was in the children's best interest.

{¶ 88} For these reasons, we find Ze.S.'s first assignment of error and J.S.'s fourth assignment of error not well-taken.

### III. Conclusion

{¶ 89} We find J.S.'s four assignments of error and Ze.S.'s three assignments of error not well-taken. We affirm the February 7, 2014 judgment of the Ottawa County

35.

Court of Common Pleas, Juvenile Division, terminating J.S.'s and Ze.S.'s parental rights and granting permanent custody to OCDJFS. The costs of this appeal are assessed to appellants pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Arlene Singer, J.

James D. Jensen, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.