[Cite as *In re T.C.*, 2015-Ohio-3665.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re T.C., T.J.

Court of Appeals No.  L-15-1106

Trial Court No. JC 14241185

**<u>DECISION AND JUDGMENT</u>**

Decided:  September 10, 2015

* * * * *

Adam H. Houser, for appellant.

Jill E. Wolff, for appellee.

* * * * *

**OSOWIK, J.**

**{¶ 1}** This is an appeal from a judgment of the Lucas County Court of Common Pleas, Juvenile Division, that terminated the parental rights of appellant mother, L.C., and granted permanent custody of her child T.C., a.k.a. T.J., to appellee Lucas County Children Services ("agency" or "LCCS" ).  For the reasons that follow, the judgment of the trial court is affirmed.

{¶ 2} The record reflects that T.C., biological child of appellant, was born in June 2014. T.C.'s birth came approximately one month after appellant lost permanent custody of her six older children. The trial court's decision in that matter was affirmed by this court on December 19, 2014. *See In re T.B.,* 6th Dist. Lucas No. L-14-1122, 2014-Ohio-5589. On June 23, 2014, LCCS filed a complaint in dependency and motion for shelter care hearing regarding T.C. A shelter care hearing was held on that date and the child was placed in the interim temporary custody of the agency. Attorneys were appointed to represent the parents and a guardian ad litem was appointed to represent the child. Father, whose parental rights were terminated as well, has not appealed. Accordingly, matters of record and evidence introduced at the hearings are discussed herein primarily as they relate to mother.

{¶ 3} Concerns at the time the complaint was filed included mother's mental health, housing, prior abuse of T.C.'s siblings, the fact that mother had just recently lost permanent custody of T.C.'s siblings, father's mental health and domestic violence issues, and parenting skills for both parents.

{¶ 4} LCCS did not file an original permanent custody action at the time of T.C.'s birth because a new father was involved and the agency wanted to work with him and offer services. However, the father subsequently indicated he was not interested in services or reunifying with T.C.

{¶ 5} On October 20, 2014, T.C. was adjudicated a dependent child and temporary custody was awarded to LCCS. On November 19, 2014, the agency filed a motion for

2.

permanent custody of T.C. The matter came on for hearing on February 24 and 27, 2015. Witnesses included LCCS case supervisor Holly Mangus; Amy Meyer, the ongoing case worker; Bobbie Dankoski, the child's guardian ad litem; mother and father. Mother testified on her own behalf; father called no witnesses.

{¶ 6} Case supervisor Mangus testified that this family has a history with the agency dating back to 2009, when one of mother's children suffered a significant burn to her leg as a result of mother leaving a hairdryer underneath a comforter. Mother was convicted of child endangerment and was offered case plan services. The agency became involved again in 2011 when the children were left home alone and one suffered a subdural hematoma; neglect was substantiated at that time and case plan services were again offered. After that date, the agency received several referrals regarding mother's children missing excessive amounts of school, the children being unattended when getting of the bus after school, and the children going to school dirty and unkempt. In March 2013, the case was opened yet again based on issues of neglect as well as physical and sexual abuse.

{¶ 7} The case plan developed for mother in 2013 was still in effect at the time of the permanent custody hearing in this matter. Mangus testified the plan called for mother to complete a non-offending parenting program and a traditional parenting program, to obtain a mental health assessment and a psychological evaluation, and to obtain and maintain safe and stable housing. Mangus stated that the only service mother completed was the non-offending parenting class. As for the psychological evaluation, Mangus

3.

stated that an assessment was set up at Harbor but that mother failed to attend. Mangus arranged for an assessment at Unison but mother failed to make the necessary contact and the case was closed due to non-compliance.

{¶ 8} At the time of the final hearing, the most recent information from the caseworker as to mother's housing situation indicated she was living in a house that would not be appropriate for T.C. Mangus stated that mother would not permit the caseworker to visit that residence.

{¶ 9} Mangus testified she had talked with mother regarding mother's role in the abuse and neglect of the six older children and said mother indicated numerous times she was not responsible for the sexual abuse because she was not the perpetrator. Mangus expressed serious concerns about mother's failure to protect her children from harm. Based on mother's failure to protect her six older children and provide even the most basic care for them, Mangus stated she believed it to be in T.C.'s best interest to be in the permanent custody of LCCS.

{¶ 10} Mother was then called as a witness for LCCS. As to the 2013 case involving the   six older children, mother admitted she "didn't act properly" when she knew their father was physically and sexually abusing them. She also admitted occasionally calling their father to "whip the children." Mother knew that her case plan called for a psychological evaluation but did not believe she was supposed to be attending counseling. She admitted not going regularly to counseling at Harbor and that her case there was eventually closed. She then went to Unison for an intake evaluation in October

4.

2013 and was diagnosed with adjustment disorder and minor depressive disorder; counseling was again recommended. Mother did not attend and that case was closed. Mother was not concerned that she had not yet had the psychological evaluation required by her case plan since 2013. Mother testified she was living with her sister when T.C. was born but due to a falling out moved into Sparrow's Nest. When she eventually left Sparrow's Nest after a month or so, she did not inform the agency "for a little while." At the time of the hearing, mother was living in a "communal house." She did not know who the landlord was and stated a friend was paying her rent. She thought the "friend" would be appropriate for T.C. but was not sure, and did not know whether that individual had a criminal background or history with LCCS. Mother admitted the house was not appropriate for T.C. but denied telling her caseworker not to come to the house to meet with her. Mother also admitted that her visitation with T.C. was not consistent and said she had missed at least one visit each month since the child was born.

{¶ 11} Amy Meyer, mother's ongoing agency caseworker, testified as to her contact with the family since July 2014, the month following T.C.'s birth and reviewed mother's case plan. Meyer testified mother had not asked her to come to mother's current residence for a home visit and said her monthly visits with mother had been taking place at the agency's office at mother's request. At the time of the final hearing, Meyer was concerned that she had not been able to verify whether mother's housing was suitable for T.C. Meyer reviewed mother's history at Harbor and Unison, detailing

5.

mother's termination by Harbor and subsequent contact with Unison. While mother went to intake at Unison, she did not follow through with counseling and the case was closed.

{¶ 12} Meyer expressed concern regarding mother's failure to show insight as to her role in the removal of her six older children and mother's failure to visit consistently with T.C. Mother claimed she missed visits because she did not have transportation, but Meyer testified that the agency provided bus passes for that purpose. Meyer was not able to refer mother to a parenting program because mother had not yet completed the mental health portion of her psychological evaluation. The caseworker was also concerned that mother had not attended any of the 90-day case reviews at the agency because it indicated mother was not participating fully in the case.

{¶ 13} Meyer stated that T.C. was currently in a foster home where he was doing very well. She described the child as bonding with the other children, happy and smiling, and said he had everything he needed. Meyer testified as to her opinion that it is in T.C.'s best interest to be in the permanent custody of LCCS.

{¶ 14} Mother was called to testify again by her counsel. She stated she has changed in that she is no longer angry with her sister for taking her six children to LCCS after they disclosed the abuse and that she is working through counseling to make sure her children are not abused again. Mother stated she has learned from her mistake and still believes her six older children should be returned to her custody because she loves them. She recognized that her housing situation was an obstacle to regaining custody of T.C. Mother admitted she had not been going to counseling regularly, although she had

6.

gone to "more than eight" and had not started at Unison as planned. She admitted that on the day before the final hearing she filled out paperwork for her cousin to request custody of T.C. even though she previously had expressed concern over T.C. living with her cousin and several other family members.

{¶ 15} T.C.'s guardian ad litem, Bobbie Dankoski, testified she was appointed the child's guardian in July 2014. Dankoski stated she believed it would be in T.C.'s best interest for LCCS to take permanent custody. She commented that mother had not completed any of her case plan services other than parenting and that housing was a serious concern. She noted that T.C. is with two of his siblings and seems to be doing well.

{¶ 16} On April 2, 2015, the trial court filed a detailed judgment entry in which it granted LCCS's motion for permanent custody, finding pursuant to R.C. 2151.353(A)(4) and R.C. 2151.414(E)(1), (2), (4), (10), (11) and (16), and by clear and convincing evidence, that T.C. could not and should not be placed with either parent within a reasonable time and that pursuant R.C. 2151.414(D) an award of permanent custody to LCCS was in the child's best interest. It is from that judgment that mother appeals.

{¶ 17} Mother sets forth the following assignments of error:

> 1. The Appellant received ineffective assistance of counsel at the trial level as trial counsel failed to object to the guardian ad litem being allowed to testify and her report being submitted as part of the record.

7.

2.  The trial court abused its discretion by allowing the guardian ad litem to testify and for her report to be submitted as she failed to comply with Rule 48 of the Ohio Rules of Superintendence.

3.  The trial court decision was against the manifest weight of evidence as Lucas County Children Services did not make reasonable efforts and diligent efforts to reunify the family.

{¶ 18} Appellant's first and second assignments of error will be addressed together.  In support of these two assignments, appellant argues that trial counsel was ineffective for failing to object to the guardian ad litem's testimony and to the admission of her report, and that the trial court erred by allowing the guardian's testimony.

{¶ 19} It is well-established that claims of ineffective assistance of counsel are reviewed under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984).  In order to prove ineffective assistance of counsel, appellant must demonstrate both that the performance of trial counsel was defective and that, but for that defect, the outcome would have been different.  *Id*. at 687.  In Ohio, a licensed attorney is presumed competent.  *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 209 N.E.2d 164 (1965).

{¶ 20} Appellate courts will not reverse trial court decisions to admit a guardian ad litem's testimony and recommendation unless the trial court abused its discretion.  *Corey v. Corey*, 2d Dist. Greene No. 2013-CA-73, 2014-Ohio-3258.  An abuse of discretion connotes more than an error of law or judgment; instead, it implies that a trial

8.

court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 21} The purpose of appointing a guardian ad litem in a parental rights allocation proceeding is "to provide the court with relevant information and an informed recommendation regarding the child's best interest." Sup.R. 48(D). Rules of superintendence are not, however, "the equivalent of rules of procedure and have no force equivalent to a statute." *State v. Gettys*, 49 Ohio App.2d 241, 243, 360 N.E.2d 735 (3rd Dist.1976). They are "internal housekeeping rules which are of concern to the judges of the several courts but create no rights in individual[s]." *Id*.

{¶ 22} This court has interpreted Sup.R. 48(D) as a general guideline for the conduct of courts. *See In re E.S.*, 6th Dist. Ottawa No. OT-14-008, 2014-Ohio-3067, ¶ 64 (concluding that the trial court did not abuse its discretion by admitting the guardian ad litem's testimony and report even though appellant complained that the guardian failed to comply with Sup.R. 48(D)).

{¶ 23} In this case, we do not believe the trial court abused its discretion by considering the guardian ad litem's testimony and recommendation. The guardian testified at length as to the extent of her investigation and provided reasons for recommending permanent custody to the agency and her testimony was subject to cross-examination by all parties. Further, the trial court, as trier of fact, is permitted to assign weight to the guardian ad litem's testimony and recommendation and to consider it in the

9.

context of all the evidence before the court. *See, e.g., In re M.Z.*, 9th Dist. Lorain No. 11CA010104, 2012-Ohio-3194.

{¶ 24} Based on the foregoing and our review of the record, we find that the trial court did not abuse its discretion by allowing the guardian's testimony and the admission of her recommendation. Therefore, finding no error by the trial court as to this issue, we cannot find that trial counsel was ineffective for failing to object. Accordingly, appellant's first and second assignments of error are not well-taken.

{¶ 25} In her third assignment of error, appellant asserts that the trial court's decision was against the weight of the evidence because appellee did not make reasonable efforts to reunify the family.

{¶ 26} With respect to the agency's efforts to prevent the continued removal of T.C., the issue is not whether the agency could have done more, as appellant argues, but whether it did enough to satisfy the reasonableness standard. A reasonable effort is an "honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." *In re Weaver*, 79 Ohio App.3d 59, 63, 606 N.E.2d 1011 (12th Dist.1992).

{¶ 27} In this case, however, a determination by the trial court as to reasonable efforts was not required pursuant to R.C. 2151.419(A)(2)(e), which provides that reasonable efforts are not necessary if the parent from whom the child was removed has had his or her parental rights involuntarily terminated with respect to a sibling of the

10.

child. It is undisputed that appellant previously had her parental rights involuntarily terminated with respect to six other children.

{¶ 28} Having made the foregoing determination, however, it should be noted that the record does in fact contain evidence that LCCS put forth diligent efforts since 2013 and earlier with respect to assisting mother. Mother had a long history with LCCS and had services offered as far back as 2009 with regard to T.C.'s six older siblings. The agency developed an extensive case plan with regard to T.C. which addressed the issues of mother's mental health assessment and treatment, parenting classes, case management assistance, urine screens and visitation with T.C. Mother was not cooperative with her counseling and her attendance was sporadic at best. Her cases at Harbor and Unison were closed twice due to non-attendance. The agency caseworker met with mother repeatedly at the agency's office when mother indicated she did not want the caseworker to come to her home, which mother admitted was not suitable for T.C. Mother failed to leave a urine screen as requested by the agency on two occasions and finally left one on the third request.

{¶ 29} Upon consideration of the record, we find that LCCS put forth reasonable efforts to reunify appellant with her child and that the trial court's decision granting permanent custody of T.C. to the agency was supported by clear and convincing evidence.

{¶ 30} Accordingly, appellant's third assignment of error is not well-taken.

11.

{¶ 31} On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Costs of this appeal are assessed to appellant pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Thomas J. Osowik, J.

James D. Jensen, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.