[Cite as *In re H.G.*, 2024-Ohio-5421.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

In re H.G.

Court of Appeals Nos. WM-24-017

Trial Court Nos.  20233038

**DECISION AND JUDGMENT**

Decided:  November 15, 2024

\* \* \* \* \*

Rachael A. Sostoi, for appellee.

Abigail Wurm, for appellant.

\* \* \* \* \*

**OSOWIK, J.**

**{¶ 1}** This is an expedited appeal from a judgment by the Williams County Court of Common Pleas, Juvenile Division, which terminated the parental rights of appellant-father, W.B., to the subject minor child, H.G., and granted permanent custody of the child to appellee, Williams County Department of Job and Family Services (the "Agency"). The mother of the minor child, whose parental rights were also terminated, did not appeal the judgment, and we will limit the discussion below to appellant-father. Mother and appellant-father never married each other. For the reasons set forth below, this court affirms the juvenile court's judgment.

## I. Background

{¶ 2} The following facts are relevant to this appeal.

{¶ 3} On May 19, 2024, appellee filed a complaint alleging abuse of newborn H.G. under R.C. 2151.031(D). The complaint identified appellant-father by name and by residential address as the father of H.G., who was born on March 20, 2023, in an Indiana hospital at 26 weeks gestation weighing only one-and-one-half pounds. During the investigation, mother alleged that appellant-father hit and kicked her abdomen, causing vaginal bleeding and the premature birth, but recanted her testimony at trial.

{¶ 4} H.G.'s meconium test results were positive for THC, oxycodone, amphetamines, and methamphetamines. The umbilical cord blood tested positive for amphetamines, methamphetamines, cannabinoids, opiates, and hydrocodone. H.G. began life in the NICU, intubated on a ventilator to breathe due to immature lungs, on a feeding tube to obtain nourishment due to premature delivery, and with a heart defect called a patent ductus arteriosus.

{¶ 5} Appellant-father did not acknowledge paternity at H.G.'s birth, did not visit H.G., and did not attend the genetic testing date he scheduled.

{¶ 6} The juvenile court appointed a Court Appointed Special Advocate ("CASA") for H.G. on May 22, 2024, and she continued throughout this matter. The CASA was a nurse practitioner and had served as a court-appointed CASA since April 2021.

2

{¶ 7} After four months in the NICU, the hospital notified the parties of H.G.'s discharge on July 6, 2023. The juvenile court held an emergency hearing on July 6, and awarded appellee emergency custody for placement with a licensed foster family prepared to take H.G. The hospital required whoever was to care for H.G. to complete hospital-provided training, including an overnight hospital stay to demonstrate the required skills, before H.G.'s release because H.G. had chronic lung disease, an umbilical hernia, and a heart defect, among other problems. Appellant-father did not seek the required training to care for H.G.'s significant, daily medical needs. The foster family complied on only a few hours' notice.

{¶ 8} Due to H.G.'s medical conditions, the infant's survival depended on receiving care from a team of medical providers, including a cardiologist, nutritionist, gastrointestinal specialist, ENT specialist, pediatrician, neurologist, speech therapist, physical therapist, occupational therapist, and optometrist. H.G. was diagnosed with torticollis, retinopathy of prematurity, bronchopulmonary dysplasia, gastroesophageal reflux disease (GERD), prematurity, in-utero drug exposure, in-utero exposure to domestic violence, feeding difficulties, respiratory distress and aspiration associated with feedings, oral motor dysfunction, developmental delay, and constipation.

{¶ 9} H.G. was on multiple daily medications, including inhalers and oxygen. H.G. required feeding every three hours in a specialized manner to be fed, positioned, and monitored. It took the foster mother one hour to successfully feed H.G., followed by H.G. remaining upright for 45 minutes after each feeding. He denied that H.G. had these

3

documented medical conditions. Appellant-father claimed H.G. did not need all the services from the medical providers, and, therefore, he did not require the case plan services offered by appellee and, in fact, did not complete them.

{¶ 10} On July 12, 2023, the juvenile court held a hearing and adjudicated H.G. an abused child under R.C. 2151.031(D). Appellant-father, although disputing paternity, attended the hearing with his counsel. The juvenile court determined it was in H.G.'s best interests to continue emergency custody with appellee. The juvenile court also ordered supervised visitations. Disposition was then scheduled for August 9.

{¶ 11} Despite appellant-father's attitude, appellee's permanency goal for case plan services was reunification of H.G. with a parent, guardian, or custodian.

{¶ 12} Meanwhile, appellee filed a motion for temporary custody to formally place H.G. temporarily with the foster family. On August 9 the juvenile court determined it was in H.G.'s best interests to grant appellee's motion. Appellant-father was present with his counsel. The juvenile court determined appellant-father was H.G.'s biological father after receiving genetic testing results and ordered case plan services for him.

{¶ 13} Thereafter appellant-father sought H.G. to be placed with him because, although H.G. had a "complicated birth" due to mother's misconduct, H.G.'s medical issues are now "healed." Appellant-father argued he "complied with parenting classes (four remaining); anger management; been assessed for mental health and drugs; and participated in domestic violence counseling." Appellant-father further argued that the foster family was interfering with his visitations.

4

{¶ 14} Appellee objected to appellant-father's motion for placement for several reasons, including appellant-father had not obtained the specialized medical training to care for H.G. and had only begun his case plan services. Appellee argued that appellant-father should "work the case plan goals and establish visits with the child before the child can be disrupted from placement." Appellee concluded that while appellant-father works on his reunification plan, H.G. should remain in appellee's temporary custody.

{¶ 15} The juvenile court denied appellant-father's motion after a hearing held on November 15, 2023. Appellant-father was present with his counsel. The juvenile court determined it was in H.G.'s best interests to continue the current placement with the foster family and that appellee had, again, made reasonable efforts to finalize the permanency plan by working a case plan goal of reunification with appellant-father. Previously, the juvenile court had determined appellee made such reasonable efforts on July 12 and August 9, 2023. Appellant-father acknowledged concern about parenting H.G. with her special needs and due to his age.

{¶ 16} By January 11, 2024, the CASA filed a motion for appellee's permanent custody of H.G. under R.C. 2151.281(I) because appellant-father "has not completed case plan goals." Then on May 10, 2024, appellee filed a motion for permanent custody of H.G. under R.C. 2151.413 and 2151.414 and requested a hearing, which the juvenile court set for June 25. By the time of appellee's motion, H.G. weighed 15 pounds and 6 ounces, which CASA argued was a testament to the excellent care provided by the foster family.

{¶ 17} On May 30, 2024, appellant-father filed a motion to extend the proceedings by six months, called a bypass motion, "to allow Father additional time to meet his case plan goals." The CASA opposed the motion, arguing that appellant-father rarely exercised his visitation rights, repeatedly denied the evidence of H.G.'s medical conditions and treatment requirements, lied at his substance-abuse assessment about his alcohol use, and made insufficient progress with his case plan goals.

{¶ 18} The juvenile court denied the bypass motion on June 25, after holding a hearing. Appellant-father was present with his counsel. The juvenile court found that appellant-father "has not sought out training for the care of the child, has not contacted medical professionals, has not re-engaged in visitation with the child, has not re-engaged in parenting classes with the child, has not been re-assessed for substance abuse or mental health, has not engaged in anger management, and has not engaged in batterer's intervention classes." Appellant-father has not had a valid driver's license for 26 years and drove without a license. The juvenile court further found that appellant-father admitted failing to engage in case plan services between November 30, 2023, until May 29, 2024, which "was a voluntary choice made by the father to the detriment of the child."

{¶ 19} Then the hearing on permanent custody was held immediately after the bypass hearing on June 25, 2024. Appellant-father left after the bypass hearing without informing his counsel and did not return for the permanent custody hearing. The juvenile court heard testimony from six witnesses: two case workers, an anger management

counselor, a dual diagnosis counselor, the foster mother, and the CASA. After the parties

submitted final briefs, on August 8 the juvenile court granted appellee's motion for

permanent custody of H.G.

**{¶ 20}** In its judgment, the juvenile court made several relevant findings.

**{¶ 21}** Pursuant to R.C. 2151.414(B)(1)(a), the juvenile court found, after

considering all relevant evidence, by clear and convincing evidence that H.G. cannot be

placed with appellant-father within a reasonable time or should not be placed with him.

The juvenile court addressed the following factors.

**{¶ 22}** Pursuant to R.C. 2151.414(E)(1), the juvenile court found that, following

the placement of H.G. outside the child's home and notwithstanding reasonable case

planning and diligent efforts by appellee to assist appellant-father to remedy the problems

that initially caused the child to be placed outside the home, appellant-father failed

continuously and repeatedly to substantially remedy the conditions causing the child to be

placed outside the child's home. In reaching this determination, the juvenile court

"considered parental utilization of medical, psychiatric, psychological, and other social

and rehabilitative services and material resources that were made available to [appellant-

father] for the purpose of changing parental conduct to allow [him] to maintain parental

claim." Specifically, the juvenile court found:

> Though Father was not present at the time of the child's birth, by all
> accounts he knew Mother was pregnant and that the child had been born.
> Father did not wish to engage in any efforts to have the child placed in his
> care until after parentage was determined. Father never visited the child
> while the child was in the Hospital. He had two choices when this case began.
> He could either choose to become a viable placement or he could watch and

7

wait, failing to engage with the child. He chose the latter. His testimony and attitude throughout the case was that he was not the at-fault parent and therefore he should not be required to take any of the steps that the Court required. His lack of commitment to a very sick child was not remedied throughout the entirety of this case.

{¶ 23} Pursuant to R.C. 2151.414(E)(4), the juvenile court found that appellant-father demonstrated a lack of commitment toward H.G. by actions showing an unwillingness to provide an adequate permanent home for the child, by failing to regularly support, visit and communicate with the child when he was able to do so. Appellant-father failed to support the child, as shown by the ongoing child support arrearages owed to appellee. Appellant-father chose to disengage with appellee from the end of November, 2023 until the end of May 2024 and did not visit H.G., communicate with appellee, nor comply with his case plan requirements.

{¶ 24} Pursuant to R.C. 2151.414(E)(10), the juvenile court found that appellant-father abandoned H.G.. Appellant-father "has not seen the child, nor communicated with the child (except for a chance meeting in the Walmart store in Bryan), since November 15, 2023, more than 217 days." Although he told appellee in May 2024 he would reengage in case plan services, he did not, and he knew that both the bypass hearing and the permanent custody hearing were scheduled for June 25.

{¶ 25} Pursuant to R.C. 2151.414(E)(16), any other factor the court considers relevant, the juvenile court found H.G. has extraordinary, permanent medical needs and her daily survival requires appellant-father, if he were awarded custody, to obtain specialized training to care for her. Appellant-father disputed H.G.'s medical condition

and had not taken any steps to learn about all the diagnoses and to train to care for the infant.

{¶ 26} Pursuant to R.C. 2151.414(D)(1), the juvenile court found by clear and convincing evidence that it is in the best interest of H.G. to grant permanent custody to appellee and to terminate the parental rights of appellant-father. The juvenile court reached this decision after considering all relevant factors,

> including the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster caregivers, and any other person who may significantly affect the child; the custodial history of the child, including whether the child has been in the temporary custody of the Agency for twelve or more months of a consecutive twenty-two month period; the child's need for a legally secure permanent placement and whether that type of placement can ebb achieved without a grant of Permanent Custody to the Agency; and whether any of the factors in divisions (E)(7) to (11) of ORC 2151.414 apply in relation to the parents of the child.

{¶ 27} Appellant-father timely appealed the juvenile court's decision and set forth three assignment of error:

A. The trial court erred in granting permanent custody without a clear statement of services provided by the Agency and why those services prevented the Agency from placing and/or reuniting the minor child with appellant.

B. The CASA investigation fell below the minimum standard when making a determination of best interests of the minor child.

C. The trial court violated appellant's constitutionally protected rights as a parent by granting permanent custody of H.G. to the Agency.

9

**II. Permanent Custody Determination**

{¶ 28} We will collectively address appellant-father's three assignments of error, as they challenge different aspects of the juvenile court's determination of H.G.'s permanent custody. Appellant-father does not challenge the juvenile court's adjudication on July 12, 2023, of H.G. as an abused child.

{¶ 29} We review the juvenile court's determination of permanent custody under a manifest-weight-of-the-evidence standard. *In re L.W.*, 2023-Ohio-958, ¶ 24 (6th Dist.).

{¶ 30} We must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts to create such a manifest miscarriage of justice that the decision must be reversed. *Id.* We are mindful that the juvenile court, as the trier of fact, was in the best position to weigh the evidence and evaluate testimony so every reasonable presumption must be made in favor of the judgment and the finding of facts. *In re M.L.*, 2023-Ohio-3541, ¶ 30 (6th Dist.). A judgment on permanent custody supported in the record by some competent, credible evidence by which the court could have formed a firm belief as to all the essential statutory elements will not be reversed on appeal as being against the manifest weight of the evidence. *In re D.M.*, 2004-Ohio-3982, ¶ 8 (6th Dist.).

{¶ 31} Appellant-father challenges the juvenile court's determination to award appellee permanent custody of H.G. for three reasons.

{¶ 32} For his first assignment of error, appellant-father argues that appellee never explicitly explained why appellant-father

> was required to work a case plan in the first place; why the particular case plan goals of father were required; and why noncompletion of those goals would prevent placement of the child with him. . . . There were no case plan goals testified to that would address training for the medical needs of the child specifically or any other specialized services as it related to the care necessary for the minor child.

Appellant-father argues the result is appellee's failure to demonstrate its required "reasonable efforts."

{¶ 33} Appellee responds that the juvenile court determined at five separate hearings that appellee made reasonable efforts to prevent H.G.'s the out-of-home placement: on July 12, August 9, and November 15, 2023, and on January 10 and April 23, 2024.

{¶ 34} We disagree with appellant-father's arguments. Appellant-father attended the hearings for emergency custody, temporary custody, the case-plan semi annual review, the CASA nine-month review, and his own bypass motion where H.G.'s medical conditions and care were discussed and where the juvenile court ordered his case plan services. The juvenile court also served appellant-father with each notice and judgment. In fact, the May 9, 2024 case plan, which stated that appellee would seek permanent custody, was co-signed by appellant-father. Therefore, we find competent, credible evidence in the record that appellant-father knew mother was pregnant but denied paternity until the juvenile court determined otherwise, knew that H.G. was born with severe medical conditions, knew that H.G. was in the NICU for four months and chose

11

not to visit, knew that H.G. required immediate special care upon discharge but chose to downplay the child's needs, knew that H.G. required significant daily care but did not seek the offered training, knew of case plan management meetings but chose not to attend, and at least twice announced his intent to engage in case plan goals but did not complete them. At no time did appellee deny appellant-father the information or case plan services that would support his reunification goal.

{¶ 35} For his second assignment of error, appellant-father argues that the CASA failed to comply with Sup.R. 48(D) because, "The concerns raised by the CASA in this case are based on [domestic violence] statements by mother that may or may not have been true as the CASA never really took the time to get to know father, didn't visit him at his house and didn't discuss with him his ability or willingness to take trainings or change his life to unsure the needs of H.G. would be met."

{¶ 36} Appellee responds that appellant-father's reliance on the CASA's compliance with Sup.R. 48(D) is misplaced where such rules are merely internal housekeeping rules for court conduct that do not create substantive rights in individuals and have no force equivalent to a statute, citing *In re T.C.*, 2015-Ohio-3665, ¶ 21-22. Appellee argues that CASA compliance with Sup.R. 48(D) does not prohibit the juvenile court, as the fact finder, to assign weight to the CASA's testimony and to consider it in the context of all the evidence, citing *Id.* at ¶ 23. We agree. *In re B.M.*, 2024-Ohio-111, ¶ 273-275 (6th Dist.), citing *In re T.C.* at ¶ 20-23.

12

{¶ 37} While appellant-father appears to concede the possibility that the CASA's domestic violence concerns were true, he then places a duty on the CASA to establish his case plan services to "get to know" him and to monitor his compliance with the case plan services, duties which do not exist in Sup.R. 48(D). The CASA testified that appellant-father sent her text messages she considered "threatening," so she would not visit his home. The juvenile court specifically addressed appellant-father's criticism that the CASA did not visit his home by assuming it is appropriate. Based on the overall testimony presented on that issue, the juvenile court determined that the CASA failing to observe appellant-father's home was not a defect in the CASA's duties. Appellant-father conceded he "tried, gave up, and then changed his mind and tried a second time." Rather than take responsibility for his decisions, he blamed the juvenile court for denying his bypass motion and the CASA not knowing the father better. We are not persuaded.

{¶ 38} For his third assignment of error, appellant-father argues that the juvenile court's findings under R.C. 2151.414(B)(1)(a) did not meet the clear and convincing standard under R.C. 2151.414(E)(1), (4), (10), and (16). R.C. 2151.414(E) relevantly states:

> (E) In determining . . . whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, . . . that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent . . .
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to

13

be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties. . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; . .

(10) The parent has abandoned the child. . .

(16) Any other factor the court considers relevant.

{¶ 39} Under R.C. 2151.414(E)(1), appellant-father argues mother's actions, not his actions, caused H.G.'s removal from the hospital. By appellant-father's logic, H.G. never resided with appellant-father, so he never caused any conditions for removal that needed to be remedied. However, that logic is faulty, as the juvenile court must consider all relevant evidence. Appellant-father knew that mother gave birth to H.G., and he did not seek to be trained to bring H.G. home upon discharge from the NICU. Appellant-father still failed to obtain the training as of the permanent custody hearing, when H.G. was 15-months old. Instead, the foster family immediately took the steps in an emergency situation to be trained to care for H.G.'s numerous medical conditions and have continued to do so every day of H.G.'s life.

{¶ 40} Under R.C. 2151.414(E)(4) and 2151.414(E)(10), appellant-father argues he did not "abandon" H.G. or demonstrate a lack of commitment. He waited until verification of paternity to "actively" work the case plan and then sought the child's placement with him. His six-moth lapse between November 2023 and May 2024 was due

to "frustration" over the lack of visits with H.G., which appellant-father did not acknowledge he controlled. Then in May 2024 he sought to "reengage in the reunification process and requested an extension of time to do which was subsequently denied by this Court." Again, rather than accept responsibility for his decisions, appellant-father blamed the juvenile court. However, the juvenile court was not required to prolong the custody proceedings for appellant-father to accept and cooperate in the court-ordered case planning process. *In re T.J.*, 2024-Ohio-110, ¶ 22 (6th Dist.).

{¶ 41} Under R.C. 2151.414(E)(16), appellant-father argues the juvenile court's finding that he is not meeting H.G.'s extraordinary medical needs "is basing its belief that father was unwilling to obtain proper training to care for his minor child on a comment he made saying that 'she looks normal to me' in a photo." He argues that it is "unclear" if he would have been willing to obtain the required training if he had been given more opportunities to visit H.G. and made aware of her medical appointments to attend them. However, despite the overwhelming information in the record that H.G. requires extraordinary, daily medical care, appellant-father admitted it was "unclear" if he would have obtained the required training. Yet, as demonstrated in this appeal, appellant-father still doubts why he was required to work a case plan in the first place or why the case plan goals infer H.G.'s medical condition.

{¶ 42} It is clear from the record that appellant-father has never taken the steps to demonstrate the willingness to do what it takes to successfully care for H.G. at any time of her short life: from the day H.G. was born on March 20, 2023, where he did not visit

15

H.G., until the date of the permanent custody hearing, which he did not attend, on June 25, 2024. He did not use that 15-month period to, for example, request H.G.'s medical records,[1] to obtain training for H.G's daily care, or to obtain a valid driver's license, after not having one for 26 years, to transport H.G. to anticipated 13 to 17 medical appointments per month. H.G. was born out-of-state, was treated in the NICU out-of-state, and numerous medical appointments continue to be out-of-state.

{¶ 43} In response, appellee argues the juvenile court made, by clear and convincing evidence, several findings from the 16 factors where just one was sufficient to support the finding that H.G. cannot be placed with appellant-father within a reasonable period of time or should not be placed with appellant-father, citing *In re N.J.*, 2023-Ohio-3190, ¶ 42. We agree.

{¶ 44} Prior to granting appellee's motion for permanent custody of H.G., the juvenile court must make specific findings by clear and convincing evidence pursuant to R.C. 2151.414(B)(1). *In re A.M.*, 2020-Ohio-5102, ¶ 18. First, "that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies." *Id.* Second, that the grant of permanent custody to appellee is in the best interest of the children. *Id.*, citing R.C. 2151.414(B)(1).

{¶ 45} For the first prong, the juvenile court determined by clear and convincing evidence that R.C. 2151.414(B)(1)(a) applied to appellant-father, which states:

---

[1] One case worker testified that appellant-father finally requested H.G.'s medical records on June 17, 2024, a mere week prior to the permanent custody hearing on June 25.

[T]he court may grant permanent custody of a child to a movant if the court determines . . . by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply: (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

**{¶ 46}** Where the juvenile court determined the first prong pursuant to R.C. 2151.414(B)(1)(a), the juvenile court must also consider the presence of any R.C. 2151.414(E) factors that would indicate H.G. cannot be placed with appellant-father within a reasonable time or should not be placed with him. *In re T.G.*, 2023-Ohio-2576, ¶ 36 (6th Dist.).

**{¶ 47}** Here, the juvenile determined by clear and convincing evidence that R.C. 2151.414(E)(1), (4), (10) and (16) applied to appellant-father, but the juvenile court needed to only find one. *In re C.F.*, 2007-Ohio-1104, ¶ 50. We will address R.C. 2151.414(E)(1).

**{¶ 48}** We agree with the juvenile court's summary of the evidence for the first prong:

**{¶ 49}** Appellant-father's case plan requirements showed he was compliant regarding maintaining a stable residence and was then-employed, although he failed to provide pay stub verification of income for a PRC application for emergency assistance to families with minor children and he failed to satisfy his $2,855 child support arrearage. Although he refused drug screens from November 20, 2023 to May 30, 2024, which are

17

presumed positive results, when he has been screened for illegal substances, the test results were negative.

{¶ 50} However, appellant-father's visitations of H.G. were inconsistent. The juvenile court found:

> On July 12, 2023 the Court Ordered that Father could have supervised visits with the child through the Shalom visitation program. Father did not have orientation until September 14, 2023. He had visits on October 4, October 11, October 17, and November 15, 2023. On November 20, 2023 he told the case worker he was 'done.' No visits were scheduled by him after [that], until May 30, 2024 when he told the case worker he wanted to re-engage in visits. No visits had occurred at the time of hearing [on June 25].

{¶ 51} Appellant-father was referred for parenting education classes. "He went to four (4) classes in September and October 2023 and stopped going. He never completed the classes. He called to re-engage after May 2024 and then was a no-show on the date he scheduled, June 7, 2024."

{¶ 52} Appellant-father did not complete a second mental health and substance abuse assessment "after it was determined he was not forthright in the information provided and he did not complete anger management classes."

> The Court finds that Father began this case with expressing a desire to at least attempt to work reunification but in November walked away and abandoned his child for six(6) months when his child needed him most. He could have learned about her, her needs and begin the long process of training to care for her. He did not elect this option. Again, Father made a poor decision when he elected not to attend the Merit hearing [on June 25 for permanent custody], evidencing that he continued to lack a true commitment to his child.
> The Court also finds that Father has not been truthful in his history, has attempted to misguide the Court, all of which relates to his credibility. His attitude that it "was not his problem" that brought the child to the Court

18

and he should not have to prove himself to have his child, has continued through-out the proceedings.

{¶ 53} In order to satisfy the second prong of the permanent-custody test, the juvenile court must consider "all relevant factors," including the nonexhaustive list under R.C. 2151.414(D)(1)(a) through (e). *In re A.M.*, 2020-Ohio-5102, at ¶ 19. "Consideration is all the statute requires." *Id.* at ¶ 31. We find the juvenile court satisfied the second prong by considering all of the R.C. 2151.414(D)(1)(a) through (e) factors.

{¶ 54} Under R.C. 2151.414(D)(1)(a), interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child, the juvenile court determined by clear and convincing evidence that H.G., who had been in foster care since discharge from the NICU, was thriving in their care and are willing to adopt H.G.

> Foster Mother, [A.G.] testified at the hearing. She testified as to the training she and her husband took while H.G. was at the Hospital before she could be released. She testified that she in an R.N. by trade but is no longer employed, though has retained her licensure. [A.G.] testified as to the process that she and her family have used to care for H.G. since she was placed in their home. In addition to 13 to 17 medical appointments per month, she was required to feed H.G. every 3 hours and it took an hour to feed her and then requiring the child to remain upright for forty-five (45) minutes after each feeding. She testified that H.G.'s hernia has gotten smaller, the hole in her heart has closed and her chronic lung disease has gotten worse where she is on oxygen at night. She has a monitor that is worn at night, a portable oxygen tank for the vehicle, she has a device used to help when she begins to choke, and multiple inhalers. Through all this she testified that H.G. is a smiley baby and loving. She is now crawling. She testified that she and her husband would be willing to adopt H.G. into the only home that the child has ever known.

{¶ 55} Under R.C. 2151.414(D)(1)(b), the wishes of the child, as expressed through the child's CASA, with due regard for the maturity of the child, the juvenile

19

court determined that although H.G. was too young to express her wishes to the CASA, by clear and convincing evidence the juvenile court found the CASA, a nurse practitioner and CASA since April 2021, "has excelled at her position in this case. Her expertise and knowledge has assisted the Court and she has exceeded her duty of investigation and information provided to the Court. H.G. has been fortunate to have her as an advocate." The juvenile court then addressed appellant-father's challenge to compliance with Sup.R. 48.

> The CASA has complied with Superintendent Rule 48, except for the observation of the Father's home. The Court does not find that to be a defect in the CASA's report or requirements as sufficient testimony has been presented related to that issue. The Court places significant weight on her recommendations as she has independently investigated and provide the Court with information relative to the child. The CASA testified and stated based upon her investigation that it is in the child's best interest to have the parents' parental rights terminated and for the child to be placed into the custody of the Agency. The Court finds that the CASA's recommendations are in the best interests of H.G.

{¶ 56} Under R.C. 2151.414(D)(1)(c), the custodial history of the child, the juvenile court determined by clear and convincing evidence, that H.G. had been in appellee's custody, and with the foster family, since the emergency hearing on July 6, 2023, when discharged from the NICU, or nearly one year prior to the June 25, 2024 hearing.

{¶ 57} Under R.C. 2151.414(D)(1)(d), the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, the juvenile court determined by clear and convincing evidence, to deny appellant-father's motion to extend the proceedings by six

20

months so he could try to meet his case plan goals. The juvenile court found appellant-father provided no compelling reasons to keep H.G. in custodial limbo. Appellee, through the foster family, was meeting all of H.G.'s daily needs. "Further this Court finds that this child will have life-long medical issues where her survival literally depends on her daily care."

{¶ 58} Under R.C. 2151.414(D)(1)(e), whether any of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child, the juvenile court determined by clear and convincing evidence that R.C. 2151.414(E)(10) applied because "Father has not seen the child, nor communicated (except for a chance meeting in the Walmart store in Bryan), since November 15, 2023, more than 217 days."

{¶ 59} While appellant-father professed to love H.G., that parental interest did not preempt the juvenile court's foregoing determinations. "Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *In re B.C.*, 2014-Ohio-4558, ¶ 20.

{¶ 60} Upon review we find the juvenile court's grant of appellee's motion for permanent custody of H.G. was not against the manifest weight of the evidence, and the court did not clearly lose its way to create such a manifest miscarriage of justice as to require reversal of the judgment. The juvenile court's determinations were supported by clear and convincing evidence in the record.

{¶ 61} Appellant-father's first, second, and third assignments of error are not well-taken.

21

### III. Conclusion

**{¶ 62}** The judgment of the Williams County Court of Common Pleas, Juvenile Division, terminating appellant-father's parental rights to H.G. and granting permanent custody of H.G. to appellee is affirmed. Appellant-father is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Christine E. Mayle, J.

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.

22